The next case is Thakkar v. Bay Point Capital Partners. Mr. Sampson is here for the appellate, Mr. Isbell for the appellee, Mr. Sampson you may Good morning, your honors. May it please the court, Daniel Sampson on behalf of Chittranjan Chuck Thakkar. It's important to remember the procedural posture of this case. This was a Georgia State Court action for wrongful foreclosure and for essentially absconding with $9 million, $8 million worth of property in order to satisfy a $2.7 million debt. It was removed to the bankruptcy court on the thinnest of reeds because the bankruptcy court had lifted the automatic stay to allow the appellee to exercise its remedies under the settlement agreement. It then gets to the bankruptcy court and is quickly dismissed. So we are here on a dismissal. So there's merely an amended complaint with its attachments and a motion to dismiss with its attachments. But this property that you say was worth $8 million and sold for too little was not the property of your client. It was the property of the bankrupt estate, which by now has actually settled and agrees with the sale, correct? That is, that may or may not be true. We haven't gone through. It is absolutely alleged in the complaint. In fact, it's at docket entry. Well, in the amended complaint, it is alleged in the count for a wrongful foreclosure that Mr. Thacker was harmed, directly harmed. That is an allegation that must be taken as true. I believe it's true. But I'm just saying what we know for sure, whatever his allegation is, we know that as a legal matter, this is the property of the bankrupt estate. And that company has now settled and says everything's fine by us. So your client doesn't own the property? He was, my client is the personal guarantor on those loans. I thought those loans were wiped out, that that guarantee was wiped out once the debt was repaid. Sure. But he was directly affected when the foreclosures on those properties happened, right? His credit gets affected by the fact that he was the signatory on those loans. But the loans are wiped out. Yes, Your Honor, the loans have been wiped out. But we're here because his credit was affected for a short period of time, because maybe he was going to have to pay a loan that he didn't have to pay? Also because he is a more than 80% equity stakeholder in DCT. And because, again, although it happened after the orders that were entered by the Bankruptcy Court and the District Court, in an August 2019 operating report by the Chapter 11 trustee, there remains only $33,000 in unsecured claims to pay out. There are $0 in secured claims to pay out. So any money that would have, that would accrue to either Mr. Thacker or to the DCT estate by, essentially, if this Court were to reverse and Mr. Thacker were to prevail on his actions, there would be an additional at least $5.3 million that would flow directly to Mr. Thacker. He chose to incorporate. We've got a corporate entity that we recognize. That corporate entity went through bankruptcy and that corporate entity actually settled. So Mr. Thacker now is turning around saying, well, I used the corporate form for whatever purpose I chose, but now hear me out. But he has nothing to do with the, he's not the corporation. He, well, he's the managing member of the corporation. He's the more than 80% stakeholder in the corporation. The case law does say that in those circumstances, one is a person aggrieved because we can show that there would be an excess and that excess would flow to equity. He's the equity. He's the managing member. He gets to decide what to do with it. And this is in the zone of interest that the Bankruptcy Code is meant to protect because one, there'd be money available, potentially available for Mr. Thacker to pay the SEG and good gateway creditors. That's essentially the judgment that started this all. The money would flow to the estate. The money would flow to the estate. And then the trustee would decide. Well, but there's only $33,000 left. But assuming you were to prevail, which is how you're arguing your client is aggrieved, the money would flow back to not the company, and the company is not part of this appeal, but it would flow back to the estate. And then the trustee would decide, how is this a direct? Because there's only $33,000 left in unsecured claims to pay. Let's pretend you win and the more money flows back. It goes to anything that doesn't go to pay off that $33,000 that's left in unsecured creditors. Not flowing directly to your client. No, it flows to the DCT estate and then it goes to the equity. My client is equity. Look, what the case law establishes is, if we could establish that any excess would go to equity, equity is a person aggrieved. And because there's only $33,000 left in unsecured claims and no secured claims, that money would flow to the bankruptcy trustee and it would then necessarily have to go to Mr. Thacker. In order for that to take place, don't you have to be a person protected by the bankruptcy code? You have to be within the zone of interest protected by the bankruptcy code. So you have to be a direct pecuniary loss or impediments to your rights, and that's within the zone of interest protected by the bankruptcy code. We argue that there are two interests protected by the bankruptcy code. One is, there will be additional money available to Mr. Thacker to pay off, although not a creditor of DCT, one of his creditors, which is the Good Gateway, which holds a judgment. We pointed that out in the supplemental briefing. Let me understand practically how, this is like a law school exam of a legal question, how you think this should have worked. So let's assume you're getting to say your claim about that they shouldn't have sold both properties at one time. Your argument is that one of the two properties, when he didn't come up with the $2.85 million, one of the two properties should have been sold, but not both. Correct. So your argument is that notwithstanding the contract said they could sell both, they should have picked one of the two, they would have had the foreclosure sale, and the only person of the debt. Right? Right. So that person, let's say they're going to say I pay $1.4 million for the property, wouldn't they have come back the next week or month, sold the next one for another $1.4 million, and would have been totally consistent with the contract, even under your theory? Mr. Thacker is entitled to test that, whether or not what those actual values of those properties were, and whether it was a commercially reasonable disposition or commercially reasonable election of revenue. Wasn't it tested with the first foreclosure sale, if it was worth $8 million, wouldn't there have been plenty of people out there on the courthouse step to pay that $8 million? I don't know, Your Honor. He got a sale. He got a sale. And we saw what the market did. The Applebee's credit bid on that, and there were no other bidders. That's correct. But when they took the property, it was worth more. It's alleged. It's verified allegations. I believe that. But nobody came to the courthouse steps and paid $8 million for the property. Well, Mr. Thacker came to the courthouse steps with a letter from his counsel, which had been sent days before, that says, there is $2.8 million sitting in my client trust account. We're tendering it upon receipt that you will accept the money. Did it say client trust account? Did it say escrow account? Did it specifically say it was an IOLTA account? It said it's in my . . . It says, I can confirm to you that the sum of $2.8 million is in escrow to be tendered on behalf of DCT, and such sum can be remitted to Baypoint upon receipt of written acknowledgement that will accept this tender. That it certainly . . . Our understanding of this is that it was in the lawyer's trust account. But it doesn't say that. It says it's an escrow account. It could be a bank. It could be . . . I mean . . . There's a lawyer making representations as to money under his control. That would be under the Georgia ethics rules. There's a pot of money that comes from his client under the lawyer's control. The lawyer is telling the other side, this money is going to be released to you upon a receipt. The Georgia tender statute says the only . . . the one condition you can place on tender is a receipt that you're going to accept the money because there's a longstanding Georgia . . . Why didn't he just bring a certified check? Because the money was in the account, and it couldn't come out of the account quickly enough. Apparently, they asked for a few hours delay to get that, and the appellees said no. Because they didn't . . . they wanted to take more . . . they wanted more money than was necessary to cover the debt. He could have shown up at the foreclosure sale. He had all the money he needed, $2.8 million. He shows up. He bids the $2.8 million. Then the person holding that, they say, no, we think it's worth more. They say three or four. I mean, that way, we could have test . . . he didn't really test this in any meaningful way. The funds, again, were sitting in the escrow account, and he needed a few hours to get them out. They've been waiting. He was supposed to pay the money to begin with. He doesn't. How do they know the money's anywhere? They're supposed to wait for that? Because an attorney has told them the funds are in his escrow account, and that attorney can't . . . under the Georgia Ethics Code, he can't lie. He can't say, hey, this money is here in my escrow account. It's here to pay you. I've been told to send it to you in the event of a receipt that you're going to accept it, and then not do it. That attorney would be disbarred. I don't know if you read the Georgia Supreme Court disbarment proceedings every month, but it seems like quite frequently, we have attorneys who claim money's in their escrow account and it's not really there. And they get disbarred when it's not, right? Meanwhile, these folks have property they need to deal with, right? That's true, but again, the question is, is money in a client trust account similar to a certified check? And it seems like there is an awful lot of security when a lawyer tells you, I have money here sitting here for you. They had many opportunities to do the right thing. They could have only recorded one deed in lieu. They didn't. They then could have accepted the money. They didn't. He then showed up on the courthouse steps and said again, please accept the tender. They didn't. They wanted to take $8 million to cover a $2.6 million debt. There is something fundamentally unfair about the bankruptcy process here. And this court recognized in Henry Harry Ford, citing to a Second Circuit decision called Casbro, that one of the zone of interest the bankruptcy code protects is the inherent fairness of the bankruptcy system. This was clearly not fair what they did to take more than $8 million in debt to cover $8 million in property to cover a $2.65 million debt. And again, we're here on a dismissal. Those are the allegations of the complaint and those are the allegations that need to be accepted as true. I see I'm well over my time and if I may have a few minutes for rebuttal. Thank you, Mr. Sampson. We'll hear from Mr. Isbell. Good morning and may it please the Court. John Isbell on behalf of the appellants, bay point entities, and the individual defendants. I have some prepared remarks. It sounds as if the court's questioning hit on most of the high points that I was going to address. So I'll try to hit on a few things that I think need to be corrected and a few things that caught my eye as I was preparing for oral argument this morning. First of all, this wasn't a dismissal, it was a motion for judgment on the pleadings. It's probably a technical difference, but I just wanted to make sure that the record was correct. As far as the background of the case goes, I assume that the Court has read the backgrounds, so I won't go there. What I will get into is the question that was presented and asked of us in supplemental briefing, which is whether or not Mr. Thacker qualifies as a person of grief under the Eleventh Circuit precedent. My reading of the person of grief standard is that he has to suffer a direct, adversely and pecuniary loss. And as this Court has highlighted in its questioning, the property at question that he complains of being sold was owned by DCT Systems. DCT Systems owned the property before, during and throughout the bankruptcy case until it was sold, first of all, through the recording of the deed in lieu of foreclosure, and secondly, at the foreclosure sale. Mr. Thacker did not own this property personally. He claims an interest in the property, although it's unclear in the record exactly what interest that is. There is currently a trustee, a Chapter 11 trustee, appointed over the debtor's case of DCT Systems. That trustee, as Judge Carnes pointed out, has already settled with my clients and has released all claims it has against them. So, contrary to what you've heard this morning, if there is a remittal back to the bankruptcy court to have some sort of funds paid to the estate after a verdict, it will never get there because the trustee, who would be the plaintiff in that case, has already settled with my client for zero consideration. He couldn't really renege on that settlement, I guess. Right. He can't un-wring the settlement. It's already been approved and is now final. He could have appealed that settlement. That was in bankruptcy court. Mr. Thacker could have appealed that settlement but chose not to. So, we have a full, final, fully adjudicated, final order approving the settlement that released my client from liability. Are there two creditors in the bankruptcy court who have judgments against him individually? I believe that is the case, Your Honor, although I'm not certain that that's in the record. That having been said, again, how do those creditors recover anything from my client? They're not creditors of my client. They're not creditors even of the estate of DCT Systems. So the only way that they would get a recovery is if there's some sort of substantial contribution claim, substantive consolidation of the bankruptcy estate. Something else would have to happen before they could even recover and that assumes that the trustee is able to renege on a settlement that has already been approved by a final order of the bankruptcy court. This is all very hypothetical. In fact, in my opinion, impossible. It's not even hypothetical. The other thing I'd like to point out is that in the briefing, Mr. Thacker suggests that the personal grief standard is something that is waived if not asserted in the district court on the first instance on appeal. I went back and reviewed the cases and I don't believe that those cases stand for that proposition. The first was the Wrightwood case out of the Ninth Circuit where the court stated as follows, we previously stated and dictated that attendance and objection were necessary preconditions to a party satisfying the personal grief standard and thus have standing to appeal in order of the bankruptcy court. But recently, we clarified that attendance and objection are not prudential standing requirements in bankruptcy cases but rather relate to whether a party has waived or forfeited its rights to appeal a given order of the bankruptcy court. Nowhere in there does it say that if you don't appear at the district court level and argue that your opponent is not a personal grief that it is waived. In fact, it just deals with whether or not this is a standing issue or a waiver and forfeiture issue. Let me go back a minute to what you said which is that if there is no way, even if we assume the contract, there is no way if we decide that this should go back that any money can go to the estate because the estate is settled. And that means the money is cheap to the state, whatever, I don't know, there is no way it can get anywhere. And so the way Mr. Thacker would try to attack that would be to attack the settlement that the estate entered into the bankruptcy court during the pendency of this appeal, correct? Correct. He did not, did he have an, he did not object to that settlement? He did object to that settlement, Your Honor. And so has he filed an appeal of that? That's not before us, right? He has not filed an appeal for that. In fact, once the order went final and non-appealable, we supplemented the record in this case by providing copies of the settlement agreement and the order approving the settlement. And that time period is now passed for any sort of appeal to happen for that? Well passed, Your Honor. I believe the deadline would have been 20 days after entry. So that's the appeal he perhaps should have really filed to, so any of this would be meaningful at all? Correct. If he actually had an objection with how he was going to be impacted by the settlement, then that was the opportunity for appeal, not to come and try to collaterally attack that order through this appeal. Your Honor, getting, you know, it's kind of unfair, he had, his lawyer had, what, $2.7 million in the trust account to pay the remainder of the debt, and then they didn't respond and just sold the property for $2.85 million. What's the value of the property now? Your Honor. That, you know, bankruptcy court is a court of equity, that doesn't sound like equity to me. Well, Your Honor, the bankruptcy court made the decisions on the front end to grant relief from stay so that we could exercise our contractual remedies. So I would say that first of all. Secondly, the purported tender came after the deeds in lieu were recorded, so many months, I think about three months after relief from stay had already been granted. They had had all that time to come up with cash and funds sufficient to pay off any amount of remaining funds due under the settlement. They then, on Sunday before a Tuesday foreclosure, send a letter that says, we've got funds in escrow that we'll deliver to you if you confirm that you'll accept them. Well, there's a couple problems with that. One, title had already passed by the recording of the deeds in lieu. Two, it was not a tender under Georgia law in that it was not cash or certified funds. Three, it had a condition present to it, which is upon confirmation that you will accept this tender, we will tender. It was an offer to tender. It wasn't an actual tender under Georgia law. And third, despite the fact that Mr. Thacker suggests that this is a matter of first impression that the court should review, this is not a case where he said, this is in my client trust account. This is in my Aulta account. He said it's in escrow. We didn't know if that was escrow at a bank. No, he said it's in escrow in his lawyer's trust account. I don't believe that's what the letter said, Your Honor. I believe that the lawyer said... We'd have a different situation. You'd maybe say no different result if instead of all these conditions he's throwing out and that he might pay you, if he had just come up, here it is, the cash. Here it is, the certified check right here. Then you would have had to make a decision, but he didn't do any of those things. Then we would have had to make a decision whether it was lawful tender for a variety of other reasons. But the other thing, Your Honor, you say that it doesn't seem, Judge Wilson, you say that it doesn't seem equitable and bankruptcy is a court of equity to foreclose on two properties that are worth whatever, $8, $9, $7, $5 million, the number changes throughout the pleadings. But the fact is that the value of the property was tested at a public foreclosure sale. It was tested. Mr. Thacker was there. He offered a piece of paper that said he had $2.8 million in funds in escrow. The actual sale price was $2.825 million, which was a credit bid. He could have bought it back if he really had the money. He could have. And the other thing that Georgia law requires on tender is that you bid the amount of the debt. The debt here was actually more than $2.8 million, as evidenced by the fact there was a $2.825 million credit bid made. Again, if this property was worth more, there would have been lots of interest in it. I do foreclosure sales all the time. It's not uncommon for people to show up and bid at foreclosure sales. Also, if he had $2.8 million sitting there ready to turn over and take titles of the property, he could have bid. It's rare that lenders like to overbid what their secured debt is in order to get property, although that's not in the record here before us. Well, we haven't gotten into the merits sort of issue at all, which is what he was climbing in state court was that there was a violation of good faith and that you should have exercised good faith and just sold one. If you didn't get enough, then next month do the second one. That agreement, I believe, was that part of a settlement too, though, in the bankruptcy court or was that just something the bankruptcy court ordered, the provisions that they're now challenging and saying you acted in bad faith? That's a great question, Judge Carnes. First of all, this was a heavily negotiated settlement agreement. At that settlement agreement, the parties negotiated what the form of the relief from state order would be, which gave my client the sole discretion to exercise whatever remedies it chooses. That was a settlement, correct? That was an attachment to the settlement agreement. And they got something in return. They could have well negotiated if they wanted what they wanted, which said you only get to sell the first property. If you don't have enough, then you sell the second. They didn't do that. That's correct. And you gave them something and they gave you something back and forth as settlements go, correct? That is correct, Your Honor. And if you look at the settlement agreement, it's a little bit hard to tell throughout the complexity of a rather lengthy, very difficult, excuse me, very much negotiated document. But there's provisions that said you can take deeds in lieu and just apply a certain amount of money or you can take them subject to the debt and do a public foreclosure. The reason why the public foreclosure option was to allow the market to test the value of the property. Does the settlement agreement specifically give Baypoint absolute discretion to record the deeds? I believe the term that is used is in its discretion other than in the order itself, it is in its sole discretion. So there is throughout the document, Baypoint has discretion to record the deeds in lieu or to exercise other remedies. In the stay relief order, which again is part of the... I thought the language used is exercise its remedies. I'm sorry? The settlement agreement says you have the absolute discretion to record the deeds? No, I believe it says in parts of the settlement agreement that Baypoint in its discretion can record the deeds or perform other remedies. In the order that was attached to the settlement agreement, which again is part of the settlement agreement, it uses the language in its sole discretion and that indeed was also the order that was entered by the bankruptcy court. Just clarify for me the document that says sole discretion and the document that just says discretion. Just one more time. The document that says sole discretion was the exhibit to the settlement agreement itself, which was the form of order that the parties could present to the bankruptcy court upon an event of default. The document that says discretion is the settlement agreement without exhibits. So technically, sole discretion is the settlement agreement, it's just an exhibit to the settlement agreement. All that was negotiated as part of the settlement agreement, put before the court, subject to had to go back and get stay relief before the bankruptcy court. I have two minutes left, but unless there are any other questions, I can relinquish my time. Thank you. Thank you. Mr. Isbell, we'll hear from Mr. Samson. Starting backwards, the settlement agreement says that it's within their discretion. In fact, it says something akin to the phrase, if lender elects to record any deed in lieu nearly six times in the provision, which is at Documentary 4-2, 24-25. There is apparently a form order, although even that's not in the record. All that's in the record is the Bay Point Appellee's quote indent, although I don't dispute that it's accurate, of what was in that form order. In the settlement agreement itself, it just says simply something akin to what's the form order. In the agreement itself, it doesn't say sole discretion, it doesn't say absolute discretion. It just says within its discretion. Judge Carnes, I understand your question, which was, couldn't they have negotiated something else? Maybe, but at the time of the original settlement agreement, this had been a $130 million loan. At the time of the first settlement agreement, it had been paid down to $118 million. These two properties were there to cover $118 million worth of debt. By the time we get down to where the rubber meets the road and it's time to actually foreclose, it's approximately $2.635 million in debt. No one contemplated that an entity would essentially snatch $8 million to cover $2.65 million in debt. That is what the covenant of good faith and good affair dealing is for. It's a gap filling measure to fill that gap when there is some discretion in the election of revenues. The problem is, once again, you have a sale, you say that you have a sale on the courthouse steps and you think the property is worth $8 million. Nobody showed up to pay anywhere near that, whether they sell one or whether they sell two. We should be permitted discovery as to whether or not the actual values of these properties, it was reflected in the foreclosure sale where it's essentially a liquidation sale or would have been properly was more. We allege that $8 million was offered for these properties within months of the default. As to the practical problem here, and the practical problem also deals with whether you're an agreed person, according to opposing counsel, which makes sense to me, we have now a situation where, and Judge Branch pointed out, let's say he recovers the right to redo or whatever. Any money that comes through goes to the estate, it has settled, so there's no way for the money to get to your client, there's no way for it to get to the company, they settled. So what is the point of what we're doing here? Your Honor, they settled, but in that settlement agreement, everyone made, the trustee required, there was an original settlement agreement that was edited and the trustee required a nothing in this settlement agreement is going to affect Mr. Thacker's rights on appeal. So he was essentially tricked into not appealing that order. Well, but I mean, not if he thought it through at all. Where does the money go? Some money is, let's say some money is recovered and where does it go? It goes back to the estate, right? And the estate can't get out of its settlement agreement. Why does it go to the estate? He is suing, he is suing essentially these people for violating the covenant of good faith and fair dealing. The money can go directly to him. He is, he at least, he has Article 3 standing for sure, right? I don't think that that could even be disputed. Mr. Thacker has been aggrieved by this. He's the 80 percent beneficial owner of DCT. He is the personal guarantor of the loans at issue. He's the named plaintiff in the litigation. The money can go to him. I get that the property doesn't go to him, but if he wins that he properly tendered, they're going to have to pay him money. If he wins that they violated the covenant of good faith and fair dealing. I don't know how they have to pay him money. He didn't own the property, the corporation owned the property. But he, that again, these would be issues that would have to be vetted in the bankruptcy court through discovery. There's all we have here are the allegations of a complaint that state that the money can go to him. Thank you, Your Honor. Thank you. I think we have your arguments. Court is adjourned. Aye. Aye. Aye.